[Opinion delivered March 31, 1886.]

---

## [No. 1922.]

## BILL BELL *v.* THE STATE.

SELF-DEFENSE — CHARGE OF THE COURT. — See the opinion *in extenso* for a charge of the court upon self-defense, *held* insufficient because it failed to instruct the jury clearly that the existence of the reasonable apprehension of actual or apparent danger was to be considered from the standpoint of the defendant at the time of the homicide, and not from that of the jury in the light of the facts proved. See the opinion on the question.

APPEAL from the District Court of McLennan. Tried below before the Hon. B. W. Rimes.

The indictment in this case was filed in the district court of McLennan county on the 28th day of May, 1883. It charged the appellant with the murder of A. T. Moreland, in McLennan county, Texas, on the 28th day of March, 1883. A former trial upon the said indictment resulted in the conviction of the appellant for murder of the second degree, a term of seven years in the penitentiary being then assessed against him as his punishment. That conviction, upon appeal to this court, was reversed, and the case will be found fully reported in the seventeenth volume of these Reports, commencing on page 538. His present appeal is prosecuted from his conviction for manslaughter under the same indictment, the penalty assessed against him being a term of three years in the penitentiary. The evidence upon which this conviction was had, differing in several material respects from that adduced upon the former trial, necessitates a restatement of the facts.

Mr. Fowler was the first witness introduced by the State. He testified that he, his brother, the deceased, and two parties named Breland, all residents of the southeastern portion of McLennan county, Texas, visited the city of Waco on the 28th day of March, 1883, and secured quarters at a wagon yard on Austin street. Together they went that night to the Horse Shoe Theater on Bridge street, which establishment was a variety theater supplied with girls and other concomitants peculiar to such concerns. Deceased had a bottle of whisky with him, and gave the witness a drink before they reached the theater, but no one of the party was drunk. The several parties named remained together in the exhibition hall until the performance closed, which was about 12 o'clock, and then, with the crowd in attendance, adjourned to an adjoining room where a ball and dance was in progress. They had been in the ball-room but a short time when a man named Harris, whom the witness did not know, called to the deceased, and the two went off together. Witness did not know where they went. About three-quarters of an hour later, the witness suggested to his friends who had remained with him at the ball, that it was time to return to the wagon yard, and they started. As they neared the door, going out, witness heard a quarrel in progress out on the sidewalk, between two men, and recognized the voice of the deceased. When he reached the sidewalk he found that the parties quarreling were the deceased and the defendant. Deceased was demanding of the defendant the payment of a quarter of a dollar which he was claiming that the defendant was due him as change on settlement of hack hire. The defendant was standing on the sidewalk near his hack, with both hands in his overcoat pockets. The deceased's overcoat was lying on the sidewalk. The witness did not hear either the defendant or the deceased curse the other, nor did he hear the deceased tell the defendant that he did not intend to permit the defendant to steal a quarter of a dollar from him. Deceased persisted in his demand upon defendant for a quarter of a dollar, saying: "I want my change; give me my change!" Witness at this time told defendant to give the deceased his change. Defendant replied: "He will get it directly," and witness could get him to do nothing nor to say anything else about the change. About that time the deceased and the defendant rushed together. Witness was unable to say which was the aggressor. He did not see the first blow which passed between the parties, and consequently could not say by whom it was struck. The struggle lasted but a few moments, a man named Sinclair taking hold of deceased, and stopping it. Witness did not

see deceased force defendant back towards the wall or into the street. At the conclusion of the fight it was discovered that the deceased was cut over the left eye, and in the fleshy part of the left shoulder. Deceased had no arms. He, deceased, said to the witness and the parties with him, after the fight, that he did not even have a pocket-knife on his person. When the fight was over defendant went into a saloon near by, procured a quarter of a dollar, which he gave to deceased. Witness, Sinclair and other friends then took deceased to Tucker's drug store, and had his wounds dressed by Doctor Curtis. Deceased died, the witness understood, three or four days later.

Breland, the next witness for the State, testified substantially as did Fowler.

William Talley was the next witness for the State. He testified that on the night of March 28, 1883, he was a night-watchman in the city of Waco, and was on duty at the suspension bridge, about fifty yards from the Horse Shoe Theater. At about midnight witness heard loud talking in front of the theater. He heard one man calling to another: "Give me my money; I want my money." Witness started to the theater immediately, and heard the words repeated as he was going there. When he reached the sidewalk in front of the theater he found the deceased and the defendant quarreling, the deceased at that time doing the talking. Defendant was standing at the edge of the sidewalk near his hack; deceased was nearer the middle of the sidewalk. Just as the witness got upon the ground, deceased said, with an oath: "I don't intend to let you steal that quarter of a dollar from me." Defendant stepped his right foot forward and replied: "Don't accuse me of wanting to steal a quarter of a dollar," and the two men came into collision. Defendant backed, and deceased pursued him, both striking, until defendant was forced into the closed door of the Horse Shoe Theater. Some one, Sinclair the witness thought, interfered at this point, and threw the deceased back, when it was discovered that he was wounded in the manner stated by the witness Fowler. Witness saw no knife in the defendant's hand.

Doctor Joe Willis testified, for the State, substantially as he did on the former trial, and was corroborated in substance by Doctor Curtis.

W. T. Harris testified, for the State, that he was the sheriff of McLennan county, Texas, in March, 1883. The defendant forfeited his bail bond in 1883, and was re-arrested and brought back under a reward offered by his sureties. He was re-arrested, the witness

thought, in Dallas. On cross-examination the witness stated that the defendant, after his re-arrest, executed a good bond, and was at present under a good bond. The first bond executed after the re-arrest of defendant was lost. Defendant attended two or three terms of court for trial, during which time there was no bond for his appearance in existence. The State closed.

W. W. Sinclair testified, for the defense, that he was at the " Georgia House " on the night of the difficulty between defendant and deceased. The " Georgia House " was a house of prostitution, situated on the outskirts of the city of Waco. About 12 or 1 o'clock on that night the defendant drove his hack to the " Georgia House," and the deceased, whom witness knew very well, and two other parties whom he did not know, got out of the hack and went into the house. They spent some little time in the house, drinking from a bottle of whisky which was brought there by some one of the party. Witness drank with them. When, after awhile, they concluded to go back to town, witness got on the carriage box with the defendant, and rode to the Horse Shoe Theater. When they got out of the carriage, one of the parties asked defendent what they owed him. Defendant replied that they each owed him seventy-five cents. It was replied that such was not the contract, and that defendant had agreed to drive them for fifty cents apiece. Defendant replied: " That is true, but I was only to go to one house, and you have required me to go to two houses,— the Stella Hartridge and the Georgia House,— and I charge you the extra quarter for the extra house, which is customary." Deceased replied: " That is all right," and handed defendant a dollar. Another one of the party handed defendant a half-dollar. Deceased told defendant to give him his change. Defendant said: " Get your friend who owes me a quarter to hand it to you, and that will make us square all around." The other party refused to pay the extra quarter, and deceased demanded it of the defendant. Defendant replied: " I have no quarter in change, but will get it and hand it to you directly, but you ought to settle it with your friend here." Deceased replied: " I have nothing to do with my friend's business. I want my change and I intend to have it." At the same time he removed his overcoat and either handed it to some one or threw it on the pavement, and advanced upon the defendant. Defendant retreated around his hack and was followed by the deceased. Witness placed himself between defendant and deceased, and appealed to the latter not to precipitate a quarrel about a quarter of a dollar, and understood the deceased to agree to drop the matter, and, therefore, witness released him. By

this time defendant had reached a point on the sidewalk near his hack. Deceased stepped upon the sidewalk as soon as he was released by witness and recommenced the quarrel by telling defendant that he would be "G—d d—d if he should steal that quarter." The defendant replied: "Don't you accuse me of trying to steal a quarter of a dollar." The deceased thereupon rushed at defendant, who retreated around his carriage into the street. Deceased followed, striking at defendant, who, apparently, was trying to ward off the blows. Witness interfered again, throwing deceased off, when it was discovered that deceased had been cut in the manner stated by Fowler. No one caught defendant. Defendant made no effort to strike deceased after the latter was pulled off. Immediately after the fight, defendant got a quarter from a neighboring saloon, and handed it to witness to be given to the deceased. Witness gave the quarter to deceased, and took him off and had his wounds dressed. About the time that deceased told the defendant that he did not intend to permit him to steal that quarter of a dollar, some one of the crowd which had collected told deceased to "give it to him," and that he, the speaker, would "stand by him." Witness could not learn who that person was. Deceased was a man exceeding six feet in height, and, though not large and fleshy, was, apparently, a stout, muscular, vigorous man. Witness had no recollection of testifying on a former trial of this case, that he was at Stella Hartridge's house, instead of at the "Georgia House," when he was joined by the deceased.

The motion for new trial raised the question discussed in the opinion.

*Clark & Dyer*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

HURT, JUDGE. This is a conviction for manslaughter. This is the second conviction, the first being for murder in the second degree, and on appeal the judgment was reversed upon the ground, among other matters, that the court failed to instruct the jury fully as to the law of justifiable homicide.

In this record the statement of. facts differs in some material respects from that before us on the former appeal; and, if not more clearly, certainly the issue of self-defense is as pertinently presented as was done on the former trial.

Upon the subject of justifiable homicide the court charged the

jury *inter alios:* " A reasonable apprehension of death or great bodily harm will excuse a party from using all the necessary force to protect his life or person, and it is not necessary that there should be actual danger, provided he acted upon a reasonable apprehension of danger." " If, from the evidence, you believe the defendant killed the said A. T. Moreland, but you further believe that at the time of so doing the deceased had made an attack upon him which, from the manner and character of it, and the relative strength of the parties, caused him to have a reasonable expectation or fear of death or serious bodily harm, and that, acting upon such reasonable expectation or fear, the defendant killed the deceased, then you should acquit him."

Now there must be, to justify, actual or apparent danger; and the existence of the one or the other must reasonably appear at the time of the homicide. In other words, the party killing, to justify, must have reasonable apprehension or fear of death or serious bodily harm, at the time of the killing. These principles are fully and clearly given to the jury in the charge.

But to whom must the appearance of danger,— the *apprehension* of the party killing,— *reasonably* appear? To the jury after hearing *all* the evidence,— after ascertaining the *real* facts, " a great many of which might not, could not, and doubtless were not known to defendant at the time of the killing?" Or, must the real or apparent danger appear to *defendant* at the time of the homicide to be reasonable? We think the latter is correct. The jury must view the facts upon his standpoint. Each juror must place himself in the position of the defendant at the time of the homicide, and determine from all the facts, as they appeared to defendant at the time of the killing, whether his apprehension or fear of death or serious bodily harm was reasonable; and if so, they should acquit. For, says Mr. Wharton, whether the danger is apparent is to be determined from the defendant's standpoint. (Whart. on Hom., § 493; *Halley* v. *Comm.* (Ky. Ct. App.), 5 Cr. Law Mag., 47. See, also, 2 W. Va., 679.) The correctness of this proposition is now well settled. (*Jones* v. *The State,* 17 Texas Ct. App., 602; *Jordan* v. *The State,* 11 Texas Ct. App., 435; *Blake* v. *The State,* id., 581.)

When the charge was delivered to the jury, and before their retirement, counsel for defendant excepted, without avail, to the charge, specially because by the terms of the charge the jury were authorized to find against the defendant on the question of self-defense, if they believed that he had no reasonable ground of apprehension for his life or limb, when the law is, and the jury should

have been so instructed, that the question of self-defense in such cases must be determined by what might have appeared reasonable to the defendant at the time of the homicide, and not by subsequent developments as laid before the jury in the shape of evidence. This being a felony case, it was the duty of the court below to give in charge to the jury the law of the case, whether requested or not, and, failing in this, especially when the omission was excepted to at the time, it is the duty of this court to reverse the judgment.

For the defect in the charge of the court, above discussed, the judgment is reversed and the cause remanded for another trial.

*Reversed and remanded.*